The next case to be heard is United States v. Jacobs. You've been here before. Good morning, Ms. Kensington. Good morning, Your Honors. May it please the Court. I would like to focus mainly on the District Court's refusal of the credibility charge with respect to the taxpayer witnesses in this case. In this tax preparer fraud case, the government relied on nine taxpayer witnesses, all of whom had filed false returns with admittedly inflated expenses and deductions, and who had underpaid taxes for years as a result, none of whom had been charged civilly or criminally nor even required to pay back the taxes owed. Each denied any knowledge of the deductions on their own returns, which they had signed and received copies of, and they had signed statements saying that they had read them. They all testified that Ms. Jacobs, the tax preparer, made up these deductions on her own. Now, despite the clear interest that each of these taxpayers had in testifying for the government against Ms. Jacobs, and despite the District Court's own view that they were several times on the record, the Court refused a routine jury instruction requested by the defense on how to evaluate such witnesses who have an obvious interest in testifying for the government. Ms. Cassidy, I mean, the District Court gave a general discussion or instruction regarding witness credibility, and it looked to me that you had ample . . . that the defense had ample opportunity to argue just what you're saying right now, the reasons that the witness had incentive to lie, that they were involved also potentially in tax fraud. Our general principle is that we look at the charge as a whole and the arguments made at trial to determine whether your position was adequately presented. I don't see any basis for concluding that it wasn't adequately presented. In fact, the jury acquitted in one of the instances, didn't it? Yes, the jury did acquit in one instance, and that was in a case where the particular witness had lied so egregiously over such a long period of time, including to the IRS agents when they audited her before they ever approached anyone about Ms. Jacobs. Why wasn't the jury amply instructed and the defense adequately presented? Why? Because the general interest in the outcome charge the jury gave was a very general charge that did not flag at all the cooperating witnesses, the taxpayer witnesses in this case, which was the real issue. In fact, immediately following . . . You weren't allowed to argue that, weren't you? We were, but this Court has held in Vaughan and in Parole that the defense is entitled to have its theory of the case submitted to the jury as long as there is some foundation in the evidence, and this includes the theory that the government witnesses are lying. Now nowhere did the Court's charge flag for the jury that these particular witnesses should be scrutinized with great care because of their potential motive to testify for the government, and what the Court is supposed to do under Parole in Vaughan is explain the circumstances that make these witnesses likely to . . . susceptible to greater scrutiny. Explain the circumstances or ensure that the defense has an adequate opportunity to explain the circumstances? Well, if a refusal to instruct on the defense theory of the case could be harmless because the defense argued the theory of the case, there would be no right to that, really no right, and there have been cases reversing for the Court's refusal to charge the theory of the case. The Court's charge, which explains all of the elements and all the ways in which the defendant can be convicted, doesn't point out what the defense theory is or at all flag in any way these particular witnesses. In fact, immediately following the general credibility instruction on interest of witnesses, the Court explained the potential interest of the law enforcement witnesses, amazingly leaving out the main witnesses whose credibility was at issue here, which were the taxpayers. Now, the reason for the refusal was not at all that the Court thought that these witnesses were not interested and motivated to testify falsely. In fact, the Court opined that they were probably guilty of tax fraud and questioned the government on why they had never been charged a couple of times, even after hearing their testimony. Now, this was the defense theory, that the taxpayers knowingly filed false returns and then blamed it all on Ms. Jacobs, and that was what the Court seemed to think also. So the refusal to give this charge denied the defense its theory of the case charge, and it was on a ground that made no sense, and even the government doesn't really defend the Court's reason. The Court expressed its view that somehow using the phrase the defense argued would highlight the fact that the defendant did not testify. Now, that's not a reason. That's a legal error. So the only issue is whether it was harmless. And we contend it was not harmless because it affected the main credibility issue in the case. It was the defense. It was the defense theory. The government contends that there was abundant evidence because there were nine witnesses who all said the same thing, that they knew nothing and that Ms. Jacobs just made it all up. But the credibility of these witnesses all suffered from the same infirmity, their implausible denials that they knowingly filed returns. What would follow from a correct charge, a charge that, as required by Vaughn and Prawl, actually identifies the witnesses who are motivated to testify for the government and tells the jury that they must scrutinize their testimony carefully to determine whether they gain more by lying or by telling the truth? What would follow from that if the jurors actually looked at this question and determined, concluded that, yes, it looks to them like these taxpayers did knowingly submit false returns? What would follow? First, that would make them guilty of tax fraud, making it more likely that they would lie and blame Ms. Jacobs to protect themselves and curry favor with the government. Who could have charged them, as the judge pointed out? Second, what would follow would be that they would... Do you say there was evidence that the taxpayers knew that their returns were fraudulent? Yes. And briefly, what was that evidence? They had all signed forms stating that they had read the returns under penalty of perjury and they were given copies of the returns. Well, doesn't every spouse do that? Yes, but there's more. And they don't all know. Isn't that right? Maybe not. Was there evidence that they knew? There was evidence from which it couldn't be inferred that they knew. Five of the nine taxpayers continued to submit returns with similar or even greater false deductions through other preparers that they moved on to. That was maybe the best evidence, after Ms. Jacobs. And does that evidence, in your view, exonerate Ms. Jacobs? I mean, couldn't it be that they knew and she knew, and they all wanted to... I mean, her business model, it appears, was generating returns and refunds for a flat fee for taxpayers, and that's why they went to her. But the fact that they may have known doesn't necessarily mean that she didn't know also. Well, that's true as far as it goes for sufficiency of the evidence, Your Honor, but it's a very different matter in terms of the jury's fact-finding and deciding on the credibility of these witnesses. Because... Even if it didn't exonerate, it still affected their credibility. Right. It affected their credibility in two really important ways. Number one, their motivation to testify falsely and deny their actual false fraudulent behavior on their own. And second, if they lied about that, which every one of them testified at trial that they didn't know anything about this, and they never looked at their returns despite saying that they had, if they were lying, they committed perjury at trial right in front of the jury on the stand, and the jury should have subjected their testimony to extra scrutiny. And that is... What were the consequences of that? Supposing they say that, we didn't, that they were lying when we say we didn't know. We knew he was, we knew he was submitting a false return. So what? He's still submitting a false return. But they didn't. They... First of all, they... What the difference... My point is, it would have shown they were lying when they said they didn't know. It would have shown that they were lying about that, and if they were lying about that, maybe they were lying about the whole thing, which was that... The whole thing? Which was that they didn't give, that they did not give the, Ms. Jacobs these expenses. Ms. Jacobs was entitled to rely on their representations about what they spent and what they did. Did his falsity show up in other people's returns? Only in these returns. You mean that Ms. Jacobs, the tax preparer's falsity? Other than witnesses. Now, only witnesses? These witnesses, and the only other evidence they had was the evidence of, of undercover Agent Legister, who went, went in with a, and his, his interview was taped, and he testified about it. And Agent Legister's testimony does not really provide the smoking gun that the government claims. First of all, it shows Legister, unlike the majority of the taxpayer witnesses, actually describing a business that he had, and telling Ms. Jacobs about his business expenses. It did show that Ms. Jacobs estimated the total number and deductions, where Legister could not give her a specific number, but she also rejected many of his suggested deductions and requests. It also showed Legister trying too hard to set her up, and making misleading statements, for example, critically misleading statements, ambiguous statements, about when he moved from upstate, which determined several of the numbers that were on her, her, um, return. All this was in front of the jury, right? It was all in front of the jury. It was all argued to the jury. It was argued to the jury. And it was, no one was precluded from arguing the theory that these people had a motive to lie, and that... No. No, Your Honor. But the jury wasn't given the proper tools from the, from the jury instructions. You know, there were lengthy instructions given... They were told that they could discount a witness based on that witness's interest and motive to protect himself or herself. In general. But there was no flagging whatsoever of these witnesses as having a particular motive to lie or... You've reserved a couple of minutes for rebuttal. You could use it now if you would like. No. I will save it, Your Honor. Thank you. Napp. Thank you, Your Honor. May it please the Court, Greg Napp for the United States. I can agree that witness credibility was an important issue at this trial. Who was the source of the false information? Who was lying? But equally important is that in order to present her side of that argument, the defendant, Ms. Jacobs, did not need a special caution instruction on so-called taxpayer witnesses for that. And there were several reasons for that. First, there's no support in this Court's case law to treat these types of witnesses, these client witnesses, the same as Court treats other type of witnesses for whom a special credibility instruction is required. Witnesses like accomplices, co-conspirators, those who have earned cooperation agreements. In contrast to those special credibility instructions, the defendant proposed language that directed the jury to her own arguments about why these government witnesses were lying as a basis for treating those same witnesses with great care and special caution. That is the language of a special credibility instruction. Are you aware of any prosecutions in which such an instruction has been given in the tax preparation context? Not in the tax preparation context. It probably exists. I just don't have a case ready for me. Yes. Yes, it does. I mean, what I can do is tell about this Court's cases that discuss those type of instructions, and they all involve circumstances in which there's actual evidence of a cooperation agreement, evidence of prior perjury, evidence of testimony of accomplices saying they were involved in the participation of the offense. We have none of that here. Because to the extent this was just a generic credibility instruction, I can imagine it having some greater impact on the jury were the Court to lend its own force to the plausibility of an argument that these individuals had their personal incentives to not be truthful. That may be. About reliance and about how assiduous they were in presenting information. That may be. But our argument is that under these circumstances, the defendant was not entitled to that extra judicial force, because she is merely arguing that these witnesses are lying. That's the ultimate question for the jury. There's no extrinsic factor of witness credibility, such as a cooperation agreement. Except insofar as the government has foregone prosecution of the individuals on false return submission, that this might be an appropriate counterbalance for that kind of understanding. And that was her theory of the defense. And she was fully entitled to present that. But that is not a circumstance that this Court has recognized, or that any Court has recognized, for giving a special credibility instruction, again, with the language of great care and particular caution. Because whether or not these witnesses were lying, whether or not they were motivated, as the defense argued, to testify against Ms. Jacobs because they thought, rightly or wrongly, that that would delay their own prosecution, that was the ultimate argument that was presented. That's not—yes? Was there any record evidence about whether these individuals were going to be or have been prosecuted? No. No. The government, in the district court, expressed its view that it felt that these witnesses were all testifying truthfully, and that they reasonably relied on Ms. Jacobs to prepare their returns, and that they were not going to prosecute these witnesses. Did the government oppose this, or did the judge just decide not to do it? The judge just decided. At least at the charging conference, there was no express position by the government, because Judge Kunt simply denied the proposed instruction without comment. No express position? Well, and no position. Like, we didn't have the occasion to respond to the charging conference, because Judge Kunt—so no position. No position. Is it so, as they claim that some of these taxpayers were not obliged to return the refund they received? No, yeah. It's true that the evidence available at trial indicated that most of the taxpayer witnesses never had to pay the back taxes. That is true. And that was— Why is that? Because generally when, during a criminal tax investigation, the government identifies certain witnesses, my understanding is that, as a matter of IRS practice, a freeze is put on those witnesses' accounts, which prevents assessment of civil tax liability for the duration of the investigation. Well, all right. For the duration of the investigation. How about now? Well, now the statute of limitations would have been blown. Well, how about after the trial, but before the statute ran? Why was it— I don't—I think the statute would have run by then. In any case, the fact that these witnesses didn't, in most cases, didn't have to pay back the taxes on their returns was an argument that was fully presented as part of the defense's theory of the case. Is there any law that the pendency of this type of prosecution doesn't toll the statute? No law that I'm aware of. I would have thought the government—in the first place, I assume the government is very anxious to collect all taxes due. Am I right about that? Right. Okay. Yes. These taxes were due, right? They were, yes. So I would have thought the government would do everything possible, even if there isn't solid law, they'd go to court and argue that they're entitled to get this money. Yes. I will mention that restitution was ordered in this case from Ms. Jacobs. So the defendant here is under a restitution order to pay back to the government— For those liabilities that were proven at trial. That's true. She doesn't have the assets to do it. Maybe, maybe not. So the taxpayers themselves might not. I don't know that. But I would like to make a point about the authority that the defense relies on here today. They point out that generally a defendant is entitled to their theory of the defense, citing Vaughn, citing cases like Prahl. That's true, but it doesn't necessarily follow from there that that theory of the defense entitles them to a special credibility charge to treat the witnesses with great care and particular caution, especially here where the issue is who's lying? Who is the source of the false information? There was no cooperation agreement. Of course the defense can argue that these witnesses had some unspoken understanding, some unspoken incentives that if they just went along and pointed a finger at the defendant, that would work to their benefit. That's an argument. But that in and of itself is not a basis for saying you should treat these witnesses with great care and particular caution, because that was a jury question. That was the ultimate question. Who is the source of this false information? And there wasn't anything to be served by giving the request— But it does seem, as we've just been reviewing, that that's not entirely so. I mean, it was likely that the government would not come after them for the tax shortfall. That's likely, yes. But that's not part of any agreement. That's not part of any exchange or transaction, contrary to the suggestions of the defense. And for that reason, we argue there's no basis for a special caution charge. And as support for that, it's an out-of-circuit case, but we cite a Seventh Circuit case, Jordan and our briefs, where the defense had presented the same argument as presented here. They said, well, look, these witnesses weren't prosecuted. Or actually, I should correct myself, there was just one witness in the Jordan case. But this witness wasn't prosecuted, and that cast doubt on his credibility, and therefore we should get a special jury charge, a special caution charge. And the Seventh Circuit said, no, no, there's no cooperation agreement. Of course you can argue that. And it was argued, and it was fairly presented, as has been— I assume it was a subject of cross-examination even prior to the argument. I'm sorry, what was the— Absolutely. If counsel was doing his or her job. And not just one cross-examination, but nine cross-examinations. On each witness, the defense brought out testimony that these witnesses knew about the criminal tax investigation, they knew that the government thought that their returns were fraudulent, and nevertheless, they were not prosecuted. And with some exceptions, they were not required to pay back taxes. So it was fairly presented. I'm not as much concerned about no prosecution. That's pure prosecutorial discretion. But not going after money that the government is entitled to surprises me. I'm wondering, do you think the U.S. Attorney's Office might look into efforts in the future, not this case, but in the future, to make it possible to recover fraudulently obtained money? I should clarify, if there's a showing of fraud by the taxpayer, that would be a basis for extending the limitations period. But the government's theory here, and apparently one accepted by the— If you go after people in the absence of fraud, if somebody submits a return, and it's a perfectly innocent either omission of income or overstatement of deduction, the government's pretty quick to recapture it or seek to recapture it. Yes, if civil assessment is open. If it's open to you, they would do it to me. I'm just wondering why they wouldn't do it to all these other people. All I can say is a part of administrative practice from the IRS of not moving when there's a criminal investigation identifies witnesses. That's just practice. Administrative practice, while it's true as the reason, it's really one of the most awful reasons that litigants give. It's like saying it's done that way. And so all I'm asking you is do you think the U.S. Attorney's Office of the Southern District, not known for its timidity, might look into this to see if this administrative practice could be modified? I should say I don't represent that office, Your Honor. I'm from the Department of Justice. Oh, that's better. Exactly, yes. That's better. Exactly. And we're here to help you. Exactly, yes, we sure are. The Southern District let you come in and argue this appeal? It's the Eastern District. The Eastern, excuse me, the Eastern District? Yes. Really? Yes. It was tried by the tax division of the Department of Justice. I see. Well, all right. In any event, I'll rephrase the question to be the Department of Justice. Don't you think maybe you should look into it? That's a reasonable query. Now, I assume I read lies all night. Would the Court care to hear anything else, particularly on harmless error? Any other questions for me? I assume your argument is that even if we thought it should have been given, it's harmless error not to. Correct. And for many reasons, not the least of which was the overwhelming evidence of guilt, including the undercover agent operation, which was a nail in the coffin. But I'll rest on that. Thank you, Mr. Knapp. Ms. Cassidy, you've reserved two minutes. That's two. Two minutes. Okay. Thank you, Your Honors. To briefly respond to Judge Newman's question as to why these taxpayers were not even required to pay back, it's because they were government witnesses.  And some of them even testified that, no, they were hoping that they would never have to pay back. That was, I believe, Ms. Mehta. So this was the topic of cross-examination in each case. It was. It was. Some also admitted that they feared the IRS when the IRS showed up at their door. And the IRS had multiple meetings with these taxpayers, and they were scared. They knew where their interests lay. Mr. Grenion feared that he would be arrested, so he cooperated. He said that. He testified to that right on the record. And Mr. LaRose was worried when the IRS came. Of course they were worried. They had filed false returns. The IRS told them they were false and asked them to explain. They all blamed Ms. Jacobs. Now, Prawl and Vaughn require, in a circumstance like this, more than a generic instruction, particularly in a case like this, I think, where the government argued that even if the as a fallback argument and rebuttal, they argued that even because it was really so obvious that these taxpayers were not really being straightforward, the government argued that even if they did knowingly file false returns, the defendant was guilty. Now, in this context, the jury should have been instructed by the judge that they should, if they found the taxpayers knowingly submitted false returns, that they should subject these particular witnesses to extra scrutiny. They should consider that fact in considering whether they should believe their testimony, and they should carefully assess whether these witnesses were more motivated to lie or motivated to tell the truth. Also, Prawl and Vaughn require the identification of the witnesses. Specifically, the government argues that these were failure-to-charge-a-defense theory defenses, but they don't say anything about cooperation of witnesses. No, these two cases are both about cooperating witnesses. And in Prawl, also, the law does not just apply to witnesses with a formal agreement. The Prawl instruction that was given, which the court held was not even enough, was directed toward any witness who was a cooperator or was hoping for immunity or other personal advantage. That's what we have here. Thank you. Thank you. Thank you both for your arguments. We'll reserve decision in this case.